# The Secretary of the Treasury's Authority with Respect to the Civil Service Retirement and Disability Fund

5 U.S.C. § 8348 empowers the Secretary of the Treasury to suspend the investment of additional contributions to the Civil Service Retirement and Disability Fund and redeem prior to maturity CSRDF investment assets in order to avoid exceeding the statutory debt limit.

In exercising his CSRDF redemption authority, the Secretary of the Treasury may, during a "debt issuance suspension period," redeem CSRDF investment assets based on the total amount of civil service retirement and disability benefits authorized to be paid during the period.

The Secretary of the Treasury has discretion to designate the length of a debt issuance suspension period based on factors, identified by the Secretary, that are reasonably relevant to his determination.

The suspension during a debt limit crisis of CSRDF investment and the redemption of CSRDF investment assets would not cause a violation of the public debt limit.

November 10, 1995

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

You have requested advice from this Office on the authority of the Secretary of the Treasury ("Secretary") with respect to the investment assets of the Civil Service Retirement and Disability Fund ("CSRDF" or "Fund") during a debt limit crisis. Specifically, you have asked this Office:

> (1) whether the statute governing the Fund allows the Secretary to suspend the investment of Fund contributions in Treasury-issued, United States debt obligations that are subject to 31 U.S.C. § 3101(b) (the "debt limit") (such debt obligations herein referred to as "obligations of the United States") during a debt limit crisis;
>
> (2) whether the Secretary has the authority to disinvest or redeem Fund investment assets during a debt limit crisis; and
>
> (3) if the Secretary has the authority to disinvest or redeem, the conditions under which such authority may be exercised.

As the discussion below reveals, we conclude, based largely on the express terms of 5 U.S.C. § 8348, that the statute empowers the Secretary to suspend the investment of additional contributions to the CSRDF and redeem prior to maturity Fund investment assets in order to avoid exceeding the debt limit. In addition, we conclude that, in exercising his redemption authority, the Secretary may, during a "debt issuance suspension period," redeem Fund investment assets based on

286

the total amount of civil service retirement and disability benefits authorized to be paid during the period. Moreover, we conclude that redemptions so executed would free up debt issuance capacity under the debt limit, which could, in turn, be exhausted through the issuance of obligations of the United States to supplement Treasury's general cash account during a debt limit crisis. In addition, we conclude that the Secretary has discretion under the CSRDF statute to designate the length of a debt issuance suspension period, but that this discretion, though broad, is not unlimited. We also conclude that the Secretary has the authority to identify factors, consistent with the statute, that are reasonably relevant to his determination of the length of a debt· issuance suspension period. Finally, we believe that the suspension of CSRDF investment and the redemption of CSRDF investment assets during a debt limit crisis as described below would not cause a violation of the statutory debt limit.

## I. *Background*

The Secretary is required under the CSRDF statute to accept Fund contributions and pay civil service retirement and disability benefits to qualifying individuals. *See* 5 U.S.C. § 8348(a), (b). Treasury estimates that each month it receives approximately $5 billion in CSRDF contributions and disburses approximately $3.2 billion in benefits. Under present law, the Secretary is required to invest in interest-bearing obligations of the United States monies contributed to the Fund that are not immediately required to pay benefits. *Id.* § 8348(c).

According to Treasury officials with whom we have spoken, when it is not confronted with a debt limit crisis, Treasury typically invests all CSRDF contributions it receives in obligations of the United States and pays civil service retirement and disability benefits, via electronic fund transfer and checks, at the beginning of each month out of its general cash account. In connection with its monthly benefits payments, Treasury reimburses its general cash account by redeeming prior to maturity, Fund investment assets in an amount equal to the total amount of the benefits paid.[1]

You have informed us that Treasury is considering altering this process during the impending debt limit crisis. You have suggested that the Secretary might be prohibited by the debt limit from investing additional CSRDF contributions. In addition, you have informed us that the Secretary might consider accelerating the redemption of an amount of CSRDF investment assets based on a number of

---

[1] For example, we have been informed by Treasury officials that on August 1, 1995, Treasury paid approximately $3.2 billion in civil service retirement and disability benefits to qualifying individuals from its general cash account. $2.5 billion of those benefits were paid via electronic fund transfer on that date and approximately $700 million were paid with checks. To support the benefits payments made by electronic fund transfer, Treasury redeemed $2.5 billion worth of Fund investment assets on August 1, 1995. On the fourth and fifth business days following August 1, Treasury redeemed investment assets in an amount equal to the benefits paid by check on August 1, thereby affording the Fund the benefit of continued investment earnings during the period between when the benefits checks were issued and when the benefits checks were expected to be presented for payment.

months worth of civil service retirement and disability benefits payments at some point during the debt limit crisis and using the debt issuance capacity gained by the redemption to auction obligations of the United States to the public. You have also informed us that the auction proceeds would be used to augment Treasury's general cash account, so that government obligations, including obligations to pay civil service retirement and disability payments, could be paid during the debt limit crisis.

## III. *Legal Discussion*

### A. *Statutory Language*

Congress created the CSRDF to support the payment of retirement and disability benefits to certain former employees of the federal government. *See* 5 U.S.C. §§ 8301–8351.[2] When it created the Fund, Congress required the Secretary to accept contributions to the Fund and invest in interest-bearing obligations of the United States portions of the Fund not immediately required to pay civil service retirement and disability benefits. *See* Act of Sept. 6, 1966, Pub. L. No. 89–554, § 8348(b), (c), 80 Stat. 378, 584 (codified at 5 U.S.C. § 8348(b), (c) (Supp. II 1965–1966)).[3]

Obligations of the United States issued to the CSRDF are subject to the debt limit. *See* 5 U.S.C. § 8348(d).[4] Concerned that a failure to increase the debt limit might negatively affect the Fund's financial condition[5] and apparently aware of the overriding public interest in ensuring that a debt limit crisis not trigger default on obligations of the United States,[6] Congress in 1986 established rules under

---

[2] A federal government employee who is covered by the Civil Service Retirement Act, 5 U.S.C. §§ 8301–8351, must contribute a portion of his or her salary to the CSRDF. *Id.* § 8334.

[3] The provision governing Fund investments requires the Secretary to purchase on behalf of the Fund United States securities with fixed maturities bearing an interest rate "equal to the average market yield . . . borne by all marketable interest-bearing" United States debt obligations with a maturity of four years. 5 U.S.C. § 8348(d).

[4] Article I, Section 8, Clause 2 of the Constitution grants Congress the authority to "borrow [m]oney on the credit of the United States." While Congress has authorized the Secretary to borrow money, it has used the debt limit to restrict that borrowing. The debt limit currently provides:

> The face amount of obligations issued under this chapter and the face amount of obligations whose principal and interest are guaranteed by the United States Government (except guaranteed obligations held by the Secretary of the Treasury) may not be more than $4,900,000,000,000, outstanding at one time, subject to changes periodically made in that amount as provided by law through the congressional budget process described in Rule XLIX of the Rules of the House of Representatives or otherwise.

31 U.S.C. § 3101(b).

[5] *See Civil Service Retirement Trust Fund: Hearing Before the Subcomm. on Compensation and Employee Benefits of the House Comm. on Post Office and Civil Service*, 99th Cong. (1985) ("Civil Service Retirement Trust Fund Hearing") (examining the Secretary's decision, during the fall of 1985, not to invest in obligations of the United States approximately $17 billion worth of CSRDF funds and to accelerate the redemption of CSRDF investment assets).

[6] In testimony on Treasury's actions with respect to the CSRDF during the 1985 debt limit crisis, John Niehenke, Deputy Assistant Secretary for Federal Finance, Department of the Treasury, stated, "[t]he debt limit impasse has put us all in a position of facing choices we would rather not face. The Secretary has recently been faced with choosing between defaulting on all U.S. obligations, including beneficiary payments, or advancing the redemption

which the Secretary could, during a debt limit crisis, suspend the investment of Fund contributions and take other related ameliorative actions involving the Fund. *See* Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99–509, § 6002(a)–(c), 100 Stat. 1874, 1931–33 (codified at 5 U.S.C. § 8348(j)–(l)) (the "1986 Amendments").

Under the 1986 Amendments, "the Secretary . . . may suspend additional investment of amounts in the Fund if such additional investment could not be made without causing the public debt of the United States to exceed the . . . debt limit." 5 U.S.C. § 8348(j)(1). The 1986 Amendments also provide that "the Secretary . . . may sell or redeem securities, obligations, or other invested assets of the Fund before maturity in order to prevent the public debt of the United States from exceeding the. . . debt limit." *Id.* § 8348(k)(1). The Secretary's redemption authority may be exercised, however, "only during a debt issuance suspension period, and only to the extent necessary to obtain *any amount of funds not exceeding the amount equal to the total amount of the payments authorized to be made from the Fund*" during the debt issuance suspension period. *Id.* § 8348(k)(2) (emphasis added). As defined under the 1986 Amendments, a "debt issuance suspension period" is "any period for which the Secretary . . . determines . . . that the issuance of obligations of the United States may not be made without exceeding the . . . debt limit." *Id.* § 8348(j)(5)(B). The 1986 Amendments also provide that "[a] sale or redemption may be made . . . *even if, before the sale or redemption, there is a sufficient amount in the Fund to ensure that [civil service retirement and disability benefits] payments are made in a timely manner.*" *Id.* § 8348(k)(2) (emphasis added).

Anticipating that the CSRDF might incur financial losses as a result of actions taken by the Secretary during a debt limit crisis, Congress sought to mitigate those losses and ensure that, after the expiration of the debt limit crisis, the Fund would be placed in the financial position it would have been in had the actions taken by the Secretary not occurred. The 1986 Amendments provide that "[a]ny amounts in the Fund which, solely by reason of the . . . debt limit, are not invested shall be invested by the Secretary . . . as soon as such investments can be made without exceeding the . . . debt limit." *Id.* § 8348(j)(2).[7] In addition, after the expiration of a debt issuance suspension period, the Secretary must:

---

of trust fund obligations to pay those benefits. He chose the latter course to ensure that millions of Americans would continue to receive their benefits in a timely fashion." Civil Service Retirement Trust Fund Hearing at 12.

[7] This provision raises questions as to when the Secretary is required to invest Fund contributions which, on account of the debt limit, he was unable to invest when initially sent to Treasury. We believe an argument could be made, based on the 1986 Amendments' income restoration provisions and legislative history, that this statutory language merely requires the Secretary to invest the uninvested funds after the expiration of the debt issuance suspension period. We understand, however, that, during any debt issuance suspension period, Treasury will on a daily basis use whatever debt issuance capacity it has available after financing the payment of government obligations that come due on that date, to invest, on a pro rata basis up to the debt limit, as much of the uninvested government trust fund monies as is feasible. This practice will ensure that investments of uninvested CSRDF contributions are made as soon as practicable and will, in effect, reduce the amount of interest income Treasury will have to restore to the CSRDF following expiration of the debt issuance suspension period.

> immediately issue to the Fund obligations [of the United States] . . . bear[ing] such interest rates and maturity dates as are necessary to ensure that, after such obligations are issued, the holdings of the Fund will replicate to the maximum extent practicable the obligations that would then be held by the Fund if the suspension of investment . . . and any redemption or disinvestment . . . during [the debt issuance suspension period] had not occurred.

*Id.* § 8348(j)(3). The 1986 Amendments also require the Secretary to restore, on the first normal interest payment date after expiration of any debt issuance suspension period, the interest income that was lost to the Fund on account of actions taken by the Secretary.[8]

The 1986 Amendments require the Secretary to notify Congress in writing whenever, by reason of the debt limit, he will no longer be able to invest Fund monies. *Id.* § 8348(*l*)(2). They also compel the Secretary to "report to Congress on the operation and status of the Fund during each debt issuance suspension period for which the Secretary is required to take action" under the statute, within thirty days of the first normal interest payment date occurring after the expiration of the debt issuance suspension period. *Id.* § 8348(*l*)(1). Moreover, the 1986 Amendments mandate that the Secretary send a copy of the report to the Comptroller General. *Id.*

To our knowledge, Treasury has never promulgated regulations pertaining to the statutory provisions discussed above. We are also not aware of any court decisions interpreting the provisions. Accordingly, our interpretation of the 1986 Amendments stems largely from our examination of their statutory language.

The Supreme Court stated in *Blum v. Stenson*, 465 U.S. 886, 896 (1984), "[w]here . . . resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear." In this instance, we believe that the relevant statutory language provides clear guidance on several of the questions you have posed. Based on our reading of the statutory language, we conclude that the 1986 Amendments grant the Secretary authority to suspend the investment of Fund contributions when, in his opinion, such investment would result in the

---

[8] The 1986 Amendments provide:

> On the first normal interest payment date after the expiration of any debt issuance suspension period, the Secretary . . . shall pay to the Fund, from amounts in the general fund of the Treasury of the United States not otherwise appropriated, an amount determined by the Secretary to be equal to the excess of—
>> (A) the net amount of interest that would have been earned by the Fund during such debt issuance suspension period if—
>>> (i) amounts in the Fund that were not invested during such debt issuance suspension period solely by reason of the public debt limit had been invested, and
>>>
>>> (ii) redemptions and disinvestments with respect to the Fund which occurred during such debt issuance suspension period solely by reason of the public debt limit had not occurred, over
>>
>> (B) the net amount of interest actually earned by the Fund during such debt issuance suspension period.
>
> *Id.* § 8348(j)(4).

United States exceeding the debt limit. *See* 5 U.S.C. § 8348(j)(1). In addition, we conclude that the 1986 Amendments authorize the Secretary to redeem Fund investment assets prior to maturity in order to prevent the United States from exceeding the debt limit. *See id.* § 8348(k)(1). We also conclude that, pursuant to his statutory redemption powers, the Secretary may, during a debt issuance suspension period, redeem an amount of Fund investment assets not greater than the total amount of civil service retirement and disability benefits authorized to be paid during the period, even if a sufficient amount of cash exists in the Fund to pay those benefits. *See id.* § 8348(k)(2). A necessary corollary to this conclusion is that, when sufficient uninvested cash exists in the CSRDF to pay benefits, the Secretary may use the debt issuance capacity freed up by his redemption of Fund investment assets to increase, through the issuance of obligations of the United States, the amount of cash available in Treasury's general cash account.[9]

While the 1986 Amendments define debt issuance suspension period as "any period for which the Secretary . . . determines . . . that the issuance of obligations of the United States may not be made without exceeding the . . . debt limit," they do not compel the Secretary to establish the debt issuance suspension period as a specific period of time. *See* 5 U.S.C. § 8348(j)(5)(B). It is only when the Secretary seeks to exercise his redemption powers that the requirement to identify a specific period of time arises, because, as indicated above, the power of redemption is tied to a computation that requires the debt issuance suspension period to be ascertained. Consequently, the permissible length of the debt issuance suspension period becomes critical to any analysis of the Secretary's redemption authority under the Fund statute.

Although the Secretary would have to declare the debt issuance suspension period as a specific period in order to exercise his redemption powers, the 1986 Amendments do not expressly indicate how he would determine that period or the factors he would be required to take into account in establishing it. As stated above, the only guidance the statute provides is that the debt issuance suspension period must be "any period for which the Secretary . . . determines . . . that the issuance of obligations of the United States may not be made without exceeding the . . . debt limit." *Id.* Moreover, we have discovered nothing in the 1986 Amendments' legislative history that elaborates upon the express terms of the statute.[10]

---

[9] Because the debt limit applies only to "outstanding" obligations of the United States, our operating assumption has been that the accounting transaction involved in redeeming prior to maturity Fund investment assets would free up borrowing capacity under the debt limit in an amount equal to the amount of the investment assets redeemed. *See* 31 U.S.C. § 3101(b).

[10] The version of the 1986 Amendments that was initially passed by the Senate contained a definition of debt issuance suspension period that was slightly different from the definition ultimately enacted into law. The Senate-passed version defined the period as "any period for which the Secretary . . . determines that the issuance of obligations of the United States *sufficient to orderly conduct the financial operations of the United States* may not be made without exceeding the . . . debt limit." 132 Cong. Rec. 24,944 (1986) (emphasis added). The fact that the definitional language was changed in the conference held between the Senate and the House of Representatives

Continued

Because the statute and its legislative history are silent as to how the Secretary is to determine the debt issuance suspension period, we believe the Secretary has discretion to identify the factors he will rely upon in designating the length of the period. As the Supreme Court stated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984):

> "The power of an administrative agency to administer a congres-
> sionally created . . . program necessarily requires the formulation
> of policy and the making of rules to fill any gap left, implicitly
> or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231
> (1974). If Congress has explicitly left a gap for the agency to fill,
> there is an express delegation of authority to the agency to elucidate
> a specific provision of the statute by regulation. Such legislative
> regulations are given controlling weight unless they are arbitrary,
> capricious, or manifestly contrary to the statute.

*Id.* at 843–44 (alteration in original).

In view of the statutory definition of debt issuance suspension period, we believe it would be reasonable for the Secretary to take into account his assessment of whether, and if so when, an increase in the debt limit would be enacted in deter-mining, for purposes of redemption, the length of a debt issuance suspension period.[11] In the absence of an extraordinary infusion of extra cash, a statutory increase in the amount of debt which may be issued under the debt limit would be the only practical way Treasury could legally issue obligations of the United States after the debt limit had been reached.[12]

Although no public notice and comment procedures would have to be used, the Secretary would have to make the assessment based on a factual record. Like most agency fact-finding, the findings he would make to support his assessment would be upheld in court as permissible unless they were found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[13]

---

does not compel the conclusion that Congress intended by the modification to narrow the Secretary's discretion in designating the period. Accordingly, we do not believe this fact provides any guidance as to how the Secretary should define the period.

[11] We assume for purposes of this memorandum that, during a debt limit crisis, Treasury would continue its normal practice of financing scheduled principal payments of maturing obligations with additional borrowings. Therefore, the fact that Treasury would, during a debt limit crisis, be regularly retiring obligations of the United States would not, by itself, cause a reduction in the overall amount of debt outstanding subject to the debt limit.

[12] It is true that debt issuance capacity could be freed up by means other than an increase in the debt limit. Debt issuance capacity would become available, for example, upon the redemption of a significant amount of debt subject to the debt limit. But when such debt obligations are held by the public, Treasury must have the cash on hand to redeem them. Since Treasury's cash position will likely be low during a debt limit crisis, early redemptions of debt held by the public would likely be of limited use in freeing up debt issuance capacity. Refinancings as described in footnote 11 could, of course, continue during debt limit crises.

[13] Unlike the Secretary, a court evaluating the Secretary's factual findings would probably have the benefit of hindsight. However, the court would certainly have to take into account, according deference to the Secretary, the situation as it existed at the time the Secretary was required to make his decision. As the Comptroller General

In light of the foregoing discussion, we believe a decision by the Secretary establishing a debt issuance suspension period of a number of months will be consistent with his statutory authority over the CSRDF if, based on the information available to him at the time, he is able reasonably to conclude that an increase in the debt limit will not be enacted during the period. Moreover, in assessing the prospects for an increase in the debt limit, we consider it appropriate for the Secretary to take into account public statements made by congressional leaders and the President concerning their willingness to take the steps necessary to cause an increase in the debt limit, and future events that are more or less likely to affect the positions and actions of Congress and the President.

It could be argued that the term ''debt issuance suspension period'' cannot properly refer to a specific period of time set by the Secretary based on his reasonable assessment of when, after being prevented on account of the debt limit from issuing obligations of the United States, Treasury will be able to issue those obligations, but must, instead, refer to that length of time that follows the Secretary's initial determination of his inability to issue obligations of the United States during which the conditions that gave rise to that determination remained in effect. Under this alternative interpretation of 5 U.S.C. § 8348(j)(5)(B), the Secretary would not have the direct authority to determine a period of time during which obligations of the United States could not be issued without exceeding the debt limit. Instead, he would simply be able to determine the fact that obligations of the United States could not be issued without exceeding the debt limit. Subsequently, the ''debt issuance suspension period'' would be ascertained simply as that time period during which the Secretary had made such determinations.

Under this alternative interpretation, the Secretary would have no authority to establish in advance the length of a debt issuance suspension period for purposes of redemption. Accordingly, he would not be able to redeem CSRDF investment assets prior to maturity based on the length of such a period. Instead, he would be limited in his redemption authority merely to redeeming on individual monthly benefits payment dates CSRDF investment assets based on the amount of benefits authorized to be paid on those dates, and nothing more.

While the alternative interpretation of the statutory definition of debt issuance suspension period is plausible, we believe the interpretation we have set forth

---

remarked in assessing the legality of the Secretary's actions with respect to the Social Security trust funds during a 1985 debt limit crisis:

> In sum, it appears, on the basis of the information now available, that the Secretary redeemed or failed to invest the Trust Funds' assets in amounts and for periods of time greater than absolutely necessary to pay [S]ocial [S]ecurity benefits. However, this is a judgment reached only with the benefit of hindsight. The Secretary was required to act in a complex and fluid situation, without the benefit of all of the information now available. Further, the Secretary had many other duties to carry out, including managing the government's finances and investing assets of and making payments from other government-managed trust funds. Under all the circumstances involved, we conclude that he did not act unreasonably.

Letter for the Honorable James R. Jones, Chairman, Subcommittee on Social Security, from Charles A. Bowsher, Comptroller General of the United States, app. I, *Legality of Secretary of the Treasury's Management of Social Security Trust Funds During the 1985 Debt Ceiling Crisis* at 9–10 (Dec. 5, 1985).

above is more consistent with the statute's text and structure. First, the verb tense and sentence structure used in the statutory provision defining debt issuance suspension period do not militate against our interpretation, whereas they are somewhat at odds with the alternative proposal. If Congress had meant for the term debt issuance suspension period to take on the limited meaning suggested by the alternative interpretation, it could have drafted its statutory definition much more clearly. For example, instead of its current wording, the term could have been defined as "any period for which the Secretary . . . had determined . . . that the issuance of obligations of the United States could not have been made without exceeding the . . . debt limit."

Second, the structure of the provisions added to the Fund statute in 1986 supports our interpretation more than it supports the alternative. In 1986, Congress mandated that the Fund be made whole for the financial losses it incurs as a result of redemptions conducted during debt issuance suspension periods. *See* 5 U.S.C. § 8348(j)(3), (4). Under the alternative interpretation of § 8348(j)(5)(B), which was enacted at the same time, this make whole provision could never have any operative significance, because there would never be such losses. Under the alternative interpretation, the 1986 Amendments would have limited the Secretary to redeeming, on individual monthly benefits payment dates falling within debt issuance suspension periods, only the amount of Fund investment assets that he was already able to redeem in order to pay the month's benefits under normal circumstances, whether or not the debt limit prevented issuance of new obligations of the United States. Redemptions of this kind in connection with the payment of civil service retirement and disability benefits had been contemplated from the inception of the Fund,[14] and are routinely effected on monthly benefits payment dates under normal circumstances.[15] Consequently, the Fund is not, nor should it be, compensated for the investment assets that are depleted and the interest income that is not realized as a result of such routine action, because such redemptions do not create Fund losses.

On the other hand, if instead of merely mandating that the usual Fund management practices continue during debt limit crises, Congress gave the Secretary the authority to effect redemptions that are not contemplated by the Fund statute under normal circumstances and that could result in temporary financial losses, as our

---

[14] In testimony concerning Treasury's management of the Fund during the 1985 debt limit crisis, Treasury's former Deputy Assistant Secretary for Federal Finance, John Niehenke, stated:

> The investments [of the CSRDF] are to be made in special obligations of the Treasury at an interest rate set monthly on the basis of a statutory formula. Unlike other trust fund statutes, the civil service fund statute does not explicitly provide for redemption of [F]und investments in order to pay benefits.
>
> However, the statute does appropriate moneys in the [F]und for payment of benefits and administrative expenses. Since benefits cannot be paid unless investments either mature or are redeemed, it is obvious that the Secretary's authority to invest also contemplates redemption.

Civil Service Retirement Trust Fund Hearing at 10.

[15] As stated above, *see supra* pp. 286–87, under normal circumstances, Treasury typically reimburses its general cash account for the payment of monthly civil service retirement and disability benefits by redeeming, prior to maturity, Fund investment assets in an amount equal to those benefits.

interpretation admits as a possibility, then the requirements imposed by the 1986 Amendments to make the Fund whole for redemptions effected during debt issuance suspension periods would not be rendered nugatory.[16]

Mindful that statutes should be construed to give effect, if possible, to every provision, *see Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *see also Moskal v. United States*, 498 U.S. 103, 109–10 (1990), and cognizant of the Supreme Court's recent admonition that "[w]hen Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect," *Stone v. INS*, 514 U.S. 386, 397 (1995), we conclude that our interpretation of the statutory definition of debt issuance suspension period is the correct one. We also find support for our interpretation in the fact that, in the 1986 Amendments, Congress chose a verb tense and sentence structure for the statutory definition of debt issuance suspension period that render its meaning, at worst, ambiguous. When confronted with an ambiguous statute, an administrative agency is empowered to give that statute a reasonable interpretation, *Chevron*, 467 U.S. at 843,[17] which we believe our interpretation is. Accordingly, we conclude it is a permissible reading, and indeed the correct reading, of the 1986 Amendments.

## B. *Legislative History*

The 1986 Amendments' legislative history does not appear to foreclose the Secretary's use of the CSRDF in the manner described above because statutory language included in early versions of the legislation that would have arguably

---

[16]One could argue that some temporary financial losses could accrue to the Fund, when compared to normal fund management operations, whenever Treasury redeemed Fund investment assets earlier than it normally would, even if the redemptions were early by only a matter of days. In fact, Treasury engaged in some slightly-earlier-than-normal redemptions of the Social Security trust funds in 1985, and its actions were the subject of congressional inquiry and a Comptroller General's report prior to the enactment of the 1986 Amendments.

Perhaps one of Congress's intentions in enacting the 1986 Amendments was to authorize such slightly-earlier-than-normal redemptions in the future, redemptions that were made only slightly before they normally would have been made to pay benefits, while at the same time ensuring that the CSRDF was in effect indemnified for lost interest and that Fund investments were restored as nearly as practicable in such an event. The statute that was enacted, however, contains no language that cabins the Secretary's discretion to determine a debt issuance suspension period prospectively in such a way that he can only look slightly ahead in time. Instead, it simply states that the Secretary has discretion to redeem an amount of Fund investment assets not exceeding the total amount of benefits authorized to be paid during a debt issuance suspension period, and also the discretion to determine that period.

On the other hand, if the statute is interpreted in such a way that the Secretary lacks the discretion to determine a debt issuance suspension period prospectively, as the alternative interpretation would have it, then even slightly-earlier-than-normal redemptions would be barred, and the make whole provisions of the statute with respect to redemptions would be superfluous, as we have argued in the text.

[17] The Supreme Court stated in *Chevron*:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43 (footnotes omitted).

prohibited such activity was significantly changed prior to enactment. Congress enacted the 1986 Amendments as part of the Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99–509, 100 Stat. 1874 ("OBRA 1986"), nearly one year after a former Secretary, in response to a prior debt limit crisis, suspended the investment of approximately $17 billion in Fund monies, *see* Civil Service Retirement Trust Fund Hearing at 10, and accelerated the redemption of Fund investment assets, resulting in financial losses. *See id.* at 1, 11.

Legislation allowing the Secretary to suspend the investment of Fund contributions and redeem Fund investment assets during a debt limit crisis was initially introduced in the Senate by Senator Eagleton and others as an amendment to a House-Senate joint resolution increasing the debt limit. *See* 132 Cong. Rec. 18,732 (1986). The Senate passed the amendment by unanimous consent on August 1, 1986. *See id.* at 18,733. As passed by the Senate on August 9, 1986, the joint resolution contained the amendment. *See id.* at 20,377.

According to Senator Eagleton, the purpose of the amendment was "to both modify and clarify the authority of the Secretary . . . in connection with his responsibilities for investing the assets of the [Fund]." *Id.* at 18,732 (statement of Sen. Eagleton). "Specifically," he provided:

> the amendment would allow the Secretary to temporarily suspend additional investment of the [F]und's assets when such investments would otherwise result in the public debt limit being exceeded.
>
> Furthermore, after such a suspension, the Secretary would be required: First, to reimburse the [F]und for any investment lost as a result of the suspension and, second, to invest uninvested assets of the [F]und in a manner which, to the extent practicable, would make the [F]und whole, as though such suspension never occurred.
>
> Moreover, the amendment would allow the Secretary to disinvest assets of the [F]und when the [F]und is holding uninvested assets due to the public debt limit, but only when necessary to ensure timely payment of amounts authorized to be made from the [F]und.

*Id.*

The provision of the Eagleton amendment clarifying the Secretary's redemption authority during a debt limit crisis provided as follows:

> The Secretary of the Treasury may sell or redeem securities, obligations, or other invested assets of the Fund only for the purpose of enabling the Fund to make payments authorized by the provisions of this subchapter or [provisions concerning benefits payments] or related provisions of law. If the Fund holds any amounts

which, by reason of the public debt limit, are not invested, the Secretary may nevertheless make such sales and redemptions if, and only to the extent, necessary to ensure that such payments are made in a timely manner.

*Id.* The sponsors of the Eagleton amendment apparently intended to permit the redemption of Fund investment assets during debt limit crises only for the purpose of ensuring the timely payment of civil service retirement and disability benefits. Noting disapprovingly that the CSRDF had been tapped in the past to ensure that the United States remained solvent during debt limit crises, Senator Gore, a sponsor of the Eagleton amendment, declared that "[b]y treating [contributions to the CSRDF] and the [g]overnment's share of retirement pension costs as usable only for the payment of civil service retirement and disability benefits, the Congress will be restoring the confidence that has undergone severe strain over the past few years." *Id.* at 18,733 (statement of Sen. Gore).

When Senator Gorton included the language of the Eagleton amendment in an amendment to the Senate's version of OBRA 1986, S. 2706, 99th Cong. (1986), no change was made to the text of the redemption provision. *See* 132 Cong. Rec. at 24,900. Speaking in support of the Gorton amendment and describing provisions in it delineating the Secretary's authority to manage CSRDF and Social Security trust funds investments, Senator Heinz said:

> The second provision in the [amendment] protects the Social Security and civil service trust funds from uncontrolled disinvestment in the face of a debt ceiling crisis. As most of us remember, last year's disinvestment, even though it was fully repaid with interest, greatly damaged public confidence in the stability of the trust funds. . . . Under [this amendment], the Treasury can disinvest the trust funds only for the purpose of paying benefits; the borrowed money must be repaid with interest as soon as borrowing authority becomes available; and the Secretary . . . must provide advance notice of any disinvestment decisions. Enactment of this plan will send a message to retirees that the trust funds are not subject to the uncontrolled manipulation that occurred in the past.

*Id.* at 24,905 (statement of Sen. Heinz).

The Senate passed the Gorton amendment by unanimous consent on September 19, 1986. *See id.* Later that day, the Senate passed S. 2706, as amended. *See id.* at 24,918, 24,944–45. On September 25, 1986, the Senate amended H.R. 5300, 99th Cong. (1986), the version of OBRA 1986 passed by the House of Representatives, by striking the language following the bill's enacting clause and substituting the text of S. 2706, as amended. It then appointed conferees to resolve the dif-

ferences between the House and Senate-passed versions of the bill. *See* 132 Cong. Rec. at 26,151.

The legislative history preceding the conference committee on OBRA 1986 suggests a legislative intention on the part of the Senate to allow the Secretary to redeem Fund investment assets during debt limit crises only to the extent necessary to ensure the timely payment of civil service retirement and disability benefits. We know, however, that the legislative language delineating the Secretary's redemption powers changed significantly during conference with the House of Representatives. *See* H.R. Conf. Rep. No. 99–1012, at 61–62 (1986); 5 U.S.C. § 8348(k).[18] Although the conference report inexplicably failed to acknowledge the language change,[19] a comparison of the respective redemption provisions reveals significant differences in the flexibility they afforded the Secretary. While the Senate provision authorized redemption only as a means to ensure the timely payment of benefits during debt limit crises, the redemption provision drafted by the conference committee and ultimately enacted by Congress contained no such limitation,[20] expressly allowed the Secretary to redeem Fund investment assets prior to maturity in order to avoid exceeding the debt limit, and expressly empowered the Secretary to exercise his redemption powers even where a sufficient amount of money exists in the Fund to ensure that benefits are paid in a timely manner.[21] Although the Senate-passed redemption language prohibited the use of

---

[18] In addition to effecting a major change in the language of the redemption provision, the conference committee made a minor change in the legislative language setting forth the Secretary's authority to suspend investment of Fund contributions during a debt limit crisis. In place of Senate bill language allowing the Secretary to "suspend additional investment of amounts in the Fund *if necessary to ensure that the public debt of the United States does not exceed the public debt limit,*" 132 Cong. Rec. 24,944 (1986) (emphasis added), the conference report allowed the Secretary to suspend investment of the contributions only "if such additional investment could not be made *without causing the public debt of the United States to exceed the public debt limit.*" H.R. Conf. Rep. No. 99–1012 at 61 (emphasis added). This language change arguably narrowed the Secretary's ability to use his suspension powers as a debt management device.

[19] The conference report on OBRA 1986 merely provided as follows·

*Senate provision*

Section 1202 of the Senate amendment modifies and clarifies the authority of the Secretary . . . to suspend investment or to disinvest assets of the Civil Service Retirement and Disability Fund. The provision permits the Secretary temporarily to suspend investment of the Fund's assets when such investment would otherwise result in the public debt limit being exceeded. If the Secretary should suspend investment under these conditions, at the end of the suspension period the Secretary is required to make the Fund whole for any earnings lost as a result of the suspension or disinvestment by a combination of special investment and cash payment actions.

*House provision*

The House has no comparable provision.

*Conference agreement*

The Conference agreement contains the Senate language.

H.R. Conf. Rep. No. 99–1012, at 256, *reprinted in* 1986 U.S.C.C.A.N. 3868, 3901.

[20] In fact, as stated above, the redemption provision ultimately enacted allows the Secretary, in effecting redemption, to "obtain any amount of funds not exceeding the amount equal to the total amount of [authorized civil service retirement and disability benefits payments]." 5 U.S.C. § 8348(k)(2). Notably, no limitation is placed on the use of the proceeds from the redemption.

[21] We note that a summary of the conference agreement printed in the Congressional Record did describe the 1986 amendments as follows:

Allows disinvestment of civil service retirement and disability trust funds to pay benefits when the debt ceiling is approached. Restores the portfolio and repays interest if disinvestment occurs.

redemption for purposes other than ensuring the timely payment of retirement and disability benefits, the redemption provision ultimately enacted by Congress necessarily allows the use of redemption for the additional purpose of freeing up debt issuance capacity under the debt limit.

## C. *Debt Limit*

An issue that must be resolved in our analysis is whether the investment suspension and redemption activities contemplated by Treasury would violate the debt limit. An argument could be made that the failure to invest additional Fund contributions and the early redemption of Fund investment assets would create an unauthorized liability from Treasury to the Fund equal to the amount of money and/or investment assets needed to make the Fund whole after such actions. Our operating assumption has been that the Secretary would suspend the investment of Fund contributions only when, on account of the debt limit, obligations of the United States could not be legally issued. Moreover, as stated above, *see supra* note 9, we have also assumed that the accounting transaction involved in redeeming Fund investment assets prior to maturity would free up borrowing capacity under the debt limit in an amount equal to the amount of the investment assets redeemed.

The debt limit, 31 U.S.C. § 3101(b), provides:

The face amount of obligations issued under this chapter and the face amount of obligations whose principal and interest are guaranteed by the United States Government (except guaranteed obligations held by the Secretary of the Treasury) may not be more than $4,900,000,000,000, outstanding at one time, subject to changes periodically made in that amount as provided by law through the congressional budget process described in Rule XLIX of the Rules of the House of Representatives or otherwise.

This limit applies to all United States debt obligations issued by Treasury, *see* 31 U.S.C. §§ 3102–3113, except obligations of the Federal Financing Bank issued to the public with the approval of the Secretary, pursuant to 12 U.S.C. § 2288(a). It also includes debt issued by certain other federal agencies and corporations which is guaranteed as to principal and interest by the United States. *See* H.R. Rep. No. 79–246, at 2–3 (1945); S. Rep. No. 79–106, at 2 (1945).

Although Treasury would, more than likely, not be able to make the Fund whole for the Secretary's actions taken during a debt limit crisis until after an increase

---

132 Cong. Rec. 33,254 (1986). We believe, however, that this description is inconsistent with the express terms of the statute.

in the debt limit, we believe any liability to the Fund created by the Secretary's actions would not constitute an obligation within the terms of § 3101(b). Such a liability would not resemble any of the obligations referred to in § 3101(b) as being subject to the debt limit. Moreover, subsections (j) and (k) of § 8348, the 1986 amendments' investment suspension and redemption provisions, necessarily contemplate these actions and Fund reimbursements following them, even though the CSRDF statute also provides that Fund investments are subject to the debt limit. *See* 5 U.S.C. § 8348(d).

## III. *Conclusion*

Based on the foregoing, we conclude that the Secretary has the authority under 5 U.S.C. § 8348 to suspend the investment of Fund contributions and redeem Fund investment assets in order to prevent the public debt of the United States from exceeding the debt limit. We conclude further that, during a debt issuance suspension period, the Secretary may redeem Fund investment assets based on the amount of civil service retirement and disability benefits authorized to be paid during such period, and that redemptions so executed would create room for additional borrowing by Treasury under the debt limit. In addition, we conclude that any decision designating the length of a debt issuance suspension period must be reasonable, taking into account the Secretary's assessment of the period of time it would take for an increase in the debt limit to be enacted. Finally, we believe the investment suspension and redemption activities contemplated by Treasury would not contravene the statutorily prescribed debt limit.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*